# In the United States Court of Federal Claims

Nos. 13-55C, 13-97C (Consolidated)

(Filed: August 18, 2015)

*****************************************
 
AGILITY DEFENSE & GOVERNMENT
SERVICES, INC.,

               Plaintiff,

v.

THE UNITED STATES,

               Defendant.

*****************************************

|  |
|---|
| Government Contract Claim for Disposal of Surplus Property in Middle East; Requirements Contract; Firm-Fixed-Price; Reasonableness of Historical Data; Constructive Change Claim; Assumption of Risk. |

*W. Brad English*, with whom were *J. Andrew Watson III, Jon D. Levin,* and *Emily D. Chancey*, Maynard Cooper & Gale, P.C., Huntsville, Alabama, for Plaintiff.

*Michael D. Austin*, with whom were *Veronica N. Onyema*, Trial Attorney, *Joyce R. Branda*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Kenneth M. Dintzer*, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *James Hewitt*, Defense Logistics Agency, Of Counsel, for Defendant.

OPINION AND ORDER

WHEELER, Judge.

    This case involves a claim for increased costs arising from a firm-fixed-price government contract between Agility Defense & Government Services, Inc., Huntsville, Alabama ("Agility")[1] and the Defense Reutilization Management Services, an arm of the Defense Logistics Agency. The contract called for Agility to dispose of surplus property received from the military services as troops were departing from areas of operation in Iraq, Afghanistan, and Kuwait. Agility seeks approximately $6,900,000 in labor costs it

---

[1] The party named in the contract is Taos Industries, Inc., a subsidiary of Agility. For simplicity, all references to Agility in this opinion shall include Taos Industries.

incurred to process property in excess of anticipated quantities.  The case is governed by the Contract Disputes Act, 41 U.S.C. § 7101 et seq.,

Agility submitted two certified claims to the contracting officer, the first on January 31, 2012 for $4,359,071.79 covering the period April 1, 2008 through March 26, 2009, and the second on February 6, 2012 for $1,602,148.67 covering the period March 27, 2009 through June 30, 2010.[2]  The Government terminated the contract for convenience on June 30, 2010, after approximately 27 months of Agility's performance.  In addressing Agility's certified claims, the contracting officer issued two final decisions on June 14, 2012, finding that Agility was entitled to $236,363.93 on the first claim, but zero on the second claim. Agility timely appealed these final decisions to this Court on January 23, 2013 and February 5, 2013 respectively, and they were docketed as case numbers 13-55C and 13-97C.  By order dated April 2, 2013, the Court consolidated these two actions for all purposes.

The case involves an unusually high-risk contract where the contractor, Agility, was responsible for disposing of all property received at designated locations regardless of quantity, and yet the compensation to the contractor was on a firm-fixed-price basis.  If the quantities were significantly higher than expected, as they were, the chances of exceeding the firm-fixed-price were great.  The Court must determine which party, Agility or the Government, assumed the risk that the costs of performance would be higher than anticipated.

This contract also was a first of its kind, as previously the Defense Reutilization Management Services performed surplus property disposal on its own.  The Court must consider the reasonableness of the historical quantities provided by the Government, and Agility's own estimates of costs for its contract proposal.  Mitigating the contractor's risk somewhat was a provision allowing Agility to keep the revenue it received from the sale of scrap material under the contract.  Thus, if contract quantities were higher than expected, theoretically the contractor's revenue from the sale of scrap also would be higher.  In this way, the contractor would receive scrap revenue offsetting its contract performance costs.

The Government drafted a clause, H.19 "DRMO Workload Changes," which was aimed at adjusting the contract price if quantities were substantially higher or lower than expected.  This clause had never been used before, and as will be seen, its provisions were so complex and uncertain that it offered essentially no protection at all to the contractor. Nevertheless, clause H.19 received considerable attention and dialogue during performance, and therefore is relevant in understanding the actions of the parties.

---

[2]  Agility amended its claim amounts after it filed suit, increasing the claims to $4,932,118.89 and $1,974,220.31 respectively.  See December 19, 2013 Motion for Leave to Amend (Dkt. No. 13), granted by the Court on December 30, 2013.

The Court conducted a three-day trial in Huntsville, Alabama during January 27-29, 2015.  The six witnesses at trial were:  Doug Baker, Agility's Marketing Manager and Vice-President of Business Development; Karen Chillcott, Agility's Vice-President of Contracts and Procurement; Roy Mohr, Agility's Program Manager; Hobie Frady, Agility's Chief Financial Officer and Proposal Manager; James Washington, a Government Contracting Officer; and Marlowe Burns, a Contracting Officer's Representative.  The parties filed proposed post-trial findings of fact and conclusions of law on April 24, 2015, and post-trial response briefs on May 21, 2015.  The Court heard closing arguments in Washington, D.C. on June 25, 2015.

For the reasons explained below, the Court finds that the Government's estimated quantities provided to prospective offerors were based on accurate historical data.  Even though the estimates proved to be low in comparison to the actual quantities encountered during contract performance, the Government was not negligent in furnishing the historical data.  To be sure, Agility assumed a higher than normal risk in agreeing to a contract of this type, but that was a choice it voluntarily made.  In a firm-fixed-price contract like this one, the contractor assumes the risk of controlling its costs of performance, unless it can show that the Government's estimates of quantities were negligent in some respect.  The evidence does not support Agility's attempt to shift the risk to the Government, and therefore Agility's claims are denied.

<u>Findings of Fact</u>[3]

A.  <u>Background</u>

The Defense Logistics Agency ("DLA") provides supplies to the military services and supports Department of Defense acquisition activities.  Stip. ¶ 1.  The Defense Reutilization Management Services ("DRMS") is a primary field activity of DLA.  <u>Id.</u>  DRMS is responsible for the disposal of all excess personal property generated by the military services worldwide.  Stip. ¶ 2.  To accomplish its mission, DRMS has established Defense Reutilization and Marketing Offices ("DRMOs") at locations throughout the world.  <u>Id.</u>  Each DRMO is a receiving and processing facility for surplus property.  Stip. ¶ 3; Mohr, Tr. 156.

The Government employs a record-keeping system to keep track of surplus property received, and the type and amount of the property in its inventory.[4]  Once the property is

---

[3]  The Findings of Fact are based upon the evidentiary record created at trial.  Citations to the record in this opinion are as follows:  (1) January 14, 2015 Joint Stipulations of Fact (Stip. ¶ __); (2) Trial testimony (Witness name, Tr. ___); (3) Joint Exhibits, JX __; (4) Plaintiff's Exhibits, PX __; and (5) Defendant's Exhibits, DX __.

[4]  When surplus property is turned in at a DRMO, it is accompanied by a Defense Turn-in Document ("DTID").  The DTID describes the property before it is placed in a physical inventory.  Mohr, Tr. 157.

received, it is designated for reutilization by the military, or it is reduced to scrap. Mohr, Tr. 160-61. Some items must be demilitarized before they are converted to scrap. Mohr, Tr. 161. The Government employs two computer programs to facilitate the management of the surplus property. One program is known as "DAISY" and the other is known as "MIDAS." Mohr, Tr. 159; Burns, Tr. 480. The DAISY program is the information database, and the MIDAS program is the search tool that extracts information from DAISY. Mohr, Tr. 162-63; Burns, Tr. 480. Information entered into the DAISY program typically becomes accessible within 18-24 hours. Burns, Tr. 552.

Prior to 2007, the Government performed in-house all of the work relating to the receipt and processing of surplus property. Stip. ¶ 4. In December 2006, the Director of DRMS determined that the agency could not adequately support the surplus property functions in the future. Washington, Tr. 416-17. Agency management was concerned that the "planned movement of U.S. Military forces" would create more work than the agency could handle. JX 20 at 2. At that point, the agency decided to solicit and award an outside contract for this work. Stip. ¶ 4; Washington, Tr. 416-17.

B. The Solicitation

On January 18, 2007, DRMS issued Solicitation No. SP4410-07-R-007 seeking a contractor to perform all surplus property disposition services at six locations in Southwest and Central Asia. Stip. ¶ 5; JX 2. The six locations were at Bagram, Afghanistan; Camp Arifjan, Kuwait; and Camps Anaconda, Victory, Al Asad, and Speicher, Iraq. JX 2. In Block 7 of the coversheet to the Solicitation, the Government explained:

> All potential firms should understand that this [Request for Proposal] is accompanied by a Statement of Objective (attachment 1). The goal is for firms to develop and submit a Performance Work Statement that will outline in detail how it proposes to fulfill the mission requirements of DLA/DRMS. Firms are encouraged to where practical offer efficient commercial solutions that will enhance the mission while at the same time reduce cost.

Id. at 1. The Solicitation as amended contemplated the award of a single contract for a base year and four one-year options. Id. at 48; JX 4 at 6.[5] The Government planned to award a combined firm-fixed-price, time and materials, and cost reimbursement contract. JX 4 at 6. The firm-fixed-price portion covered the first six contract line items, one for each of the six designated locations, and the time and materials portion covered other locations within Iraq, Afghanistan, or Kuwait where work might be required. Id. at 7-12.

_____

[5] There were at least nine amendments to the Solicitation, although not all of them are included in the evidentiary record. See JX 2 – JX 8.

However, the contract is predominantly for a firm-fixed-price, and only the firm-fixed-price line items are at issue in this case. Section M of the Solicitation as amended stated that award would be made on a best value basis, considering past performance, price and the other evaluation factors listed. Id. at 57.

In Amendment 004 to the Solicitation, the Government added clause H.19, "DRMO Workload Changes," that stated:

> During operation of the DRMO locations, the contractor may experience significant workload increases or decreases. When workload increases at any DRMO location by more than 150% above the average workload at the DRMO location for the preceding three (3) consecutive months and a determination is made jointly by the [Contracting Officer's Representative] and On-site contractor representative that the increase will continue for more than two (2) months and contractor staff at the DRMO is insufficient to manage the workload increase, the contractor may submit a proposal to add labor and materials to handle the increase under the Time and Material CLINs. When there is a significant workload decrease at a DRMO that has not experienced a significant workload increase, and the decrease extends to three (3) consecutive months, the Government shall have the right to terminate the CLIN that covers the DRMO and renegotiate the price paid the contractor to operate the DRMO. When the Government notifies the contractor in writing of its intent to terminate the CLIN for the purpose of renegotiation, the contractor will be required to submit a proposal to continue operating the DRMO based upon the average workload at the location for the previous six (6) months excluding surges or significant workload increases.

JX 4 at 26-27. The Government designated this clause as "DRMS (Feb 2007)," indicating that clause H.19 was a new clause drafted for this contract. Id.; Washington, Tr. 428.

The Government finalized the scrap sales provisions in the Solicitation, Amendment 004, stating:

> Proceeds. The contractor is entitled to all sales proceeds collected excluding customs duties and fees. The Government anticipates such sales will offset some of the costs incurred in performing this contract. Offerors must outline in their proposals how they will conduct and enhance the sale of scrap and other property to achieve the highest revenue and show

> how its overall offer for this contract was reduced based on
> these anticipated sales.

JX 4 at 84.

Amendment 004 to the Solicitation contained a listing of the questions and answers between the agency and the offerors prior to the Preproposal Conference. JX 4 at 131-58. Question 122 asked the Government to provide the workload history and projection by category and location. The Government responded by stating "[w]orkload history and current inventory levels can be found at http://www.drms.dla.mil/newproc/index and link to 'DRMS information for Southwest/Central Asia.' The Government does not have workload projections." JX 21 at 201-02.

The agency's website contained historical workload information for each of the six DRMO locations covered by the contract. Washington, Tr. 421-22, Baker, Tr. 43. The agency updated the website's workload data on a regular basis. Washington, Tr. 422. The workload was measured by the weight of scrap processed and by the number of line items. Baker, Tr. 43, 47, 48. The website also showed the number of direct and contract staff members employed by DRMS at each location. Baker, Tr. 48; JX 50 at 3; JX 59 at 4; JX 66 at 4; JX 73 at 3; JX 76 at 4; JX 80 at 4. DRMS used the workload data for August 4, 2007 as the baseline when issuing delivery orders under the contract. Id.

Amendment 007 to the Solicitation contained a two-page spreadsheet showing the amount of scrap "turn-ins" to expect over the life of the contract. JX 6 at 11-12. The spreadsheet showed the number of expected turn-ins by weight for each of the six DRMO locations for the base year and each option year in the following categories: non-ferrous, ferrous, tires, rubbish, scrap vehicle, fuels/oils, electronic, and other. Id. Amendment 007 contained questions and answers with offerors added since the issuance of Amendment 004. Question 61 asked in part "[p]ut another way, does this proposition stand for an expectation that offerors should not be able to retain scrap revenues 'free and clear' without some reduction being reflected in the overall offer for this contract." Id. at 31. The Government responded:

> The contractor will be able to keep the proceeds from the sale
> of scrap "free and clear" without any type of reduction in
> payments. The Government requests that offerors describe
> their sales plan as well as reflect that amount of anticipated
> proceeds and how this was considered in their bid. The
> purpose of the requirement is to show how the bid price was
> influenced by anticipated proceeds and to demonstrate the
> Government received consideration for providing the scrap as
> [Government-furnished material] under this contract.

Id. at 32.

Prior to 2007, Agility acquired Taos Industries, Inc., a small firm based in Huntsville, Alabama.  Taos specialized in performing logistics contracts for the U.S. Government, but it had not previously operated a DRMO.  Baker, Tr. 38.  Agility hired three former DLA employees to provide expertise in preparing its proposal in response to the Solicitation, including the development of a Performance Work Statement ("PWS").  Baker, Tr. 39.

Agility was one of three offerors to submit a proposal in response to the Solicitation.  Stip. ¶ 14.  The agency's Source Selection Authority determined that Agility's proposal provided the best overall value to the Government.  Agility's final price was $45,233,914.92.  Baker, Tr. 68; JX 16 at 8.  The final price reflected a $20,342,608.00 offset for revenues expected from scrap.  JX 10 at 17.  Agility's proposal was based upon a staffing plan of 174 persons.  Baker, Tr. 40; JX 10 at 35-38.

C.  The Contract

DRMS notified Agility on November 29, 2007 that its proposal had been accepted for award.  Stip. ¶ 16.  The parties executed Contract No. SP4410-08-D-2000 ("the Contract") on the same day.  JX 21.  The Contract contained six line items, one for each of the DRMO locations, and each line item had a firm-fixed-price to be paid on a monthly basis.  Id. at 51.  The Contract also contained clause H.19, "DRMO Workload Changes." However, the version of clause H.19 in the Contract had been modified slightly to address potential workload decreases:

> During operation of the DRMO locations, the contractor may experience significant workload increases or decreases. When workload increases at any DRMO location by more than 150% above the average workload at the DRMO location for the preceding three (3) consecutive months and a determination is made jointly by the [Contracting Officer's Representative] and On-site contractor representative that the increase will continue for more than two (2) months and contractor staff at the DRMO is insufficient to manage the workload increase, the contractor may submit a proposal to add labor and materials to handle the increase under the Time and Material CLINs.  When there is a significant workload decrease *in excess of 50% or more* at a DRMO that has not experienced a significant workload increase, and the decrease extends to *four (4)* consecutive months, the Government shall have the right to terminate the CLIN that covers the DRMO and renegotiate the price paid the contractor to operate the DRMO.  When the Government

notifies the contractor in writing of its intent to terminate the CLIN for the purpose of renegotiation, the contractor will be required to submit a proposal to continue operating the DRMO based upon the average workload at the location for the previous six (6) months excluding surges or significant workload increases.

JX 21 at 71-72 (changes shown in italics). This version of clause H.19 was designated as "DRMS (JUL 2007)."

The agency ordered work under the Contract by placing Delivery Orders for each DRMO site. Washington, Tr. 453. The initial Delivery Orders were issued in January and February 2008. The Delivery Orders incorporated the "workload baseline" for each DRMO site as reflected by the historical data in the website update for August 4, 2007. The agency calculated the monthly baseline from the August 4, 2007 website update by adding together the two figures for "Received Line Items," each for a one-week period, and then doubling the total to obtain the monthly line items. The baselines were as follows:

| DRMO | Monthly Baseline | Annualized Baseline |
|---|---|---|
| Speicher | 1,064 | 12,768 |
| Victory | 1,166 | 13,992 |
| Al Asad | 1,218 | 14,616 |
| Anaconda | 1,662 | 19,994 |
| Arifjan | 9,130 | 109,560 |
| Bagram | 540 | 6,480 |

JX 50 at 3; JX 59 at 4; JX 66 at 4; JX 73 at 3; JX 76 at 4; JX 80 at 4; PX 114 at 2. The annualized baselines are derived simply by multiplying the monthly baseline by twelve.

From the beginning of performance, the actual workload experienced at each of the six DRMO locations, with the exception of Camp Speicher, Iraq, was much greater than the workload baselines established in the August 4, 2007 Historical Data. Mohr, Tr. 172; PX 114 at 1-3, JX 186 at 1-2. The actual annual workloads experienced from March 2008 to March 2009, by number of line items, were as follows:

| DRMO | Actual Workload | % of Annualized Baseline |
|---|---|---|
| Speicher | 9,561 | 74.9% |
| Victory | 21,899 | 156.5% |
| Al Asad | 24,392 | 166.9% |
| Anaconda | 71,653 | 358.4% |
| Arifjan | 242,401 | 221.3% |
| Bagram | 15,364 | 237.1% |

In total, the pre-March 2009 workload for all six locations was 217.2% of the annualized workload derived from the single-month baseline provided in the Delivery Orders.

Agility began contract performance at Camp Arifjan, Kuwait, where more than 60% of the contract work would be performed.   At Arifjan, Agility inherited a backlog of approximately 70,000 line items.  Mohr, Tr. 168, 271; Burns, Tr. 556-57.  In addition to the backlog, the volume of property received at Arifjan was greater than anticipated from the very beginning.  Mohr, Tr. 172.  Agility did not have the necessary staff in place to process both the backlog work and the higher than expected level of new work.  Baker, Tr. 82-83; Mohr, Tr. 167.

In May 2008, Agility began performance at the other five DRMO locations.   JX 166.  Agility encountered backlogs at these locations as well, but not to the same extent as the Arifjan backlog.  Burns, Tr. 559-60.  Early in contract performance, Lt. Gen. Dail, Director of DLA, visited the DRMO locations to assess the status of the work.  Stip. ¶ 18; Mohr, Tr. 176.  On June 8, 2008, Lt. Gen. Dail convened a meeting of DRMS personnel and Agility's senior staff to address Agility's performance issues.  Stip. ¶ 18; Mohr, Tr. 175-76.  Lt. Gen. Dail informed Agility that he would terminate the contract if Agility's performance did not improve.  Mohr, Tr. 176.

Concurrently with Lt. Gen. Dail's visit to the DRMO locations, Contracting Officer Karen Hammontree sent a June 6, 2008 letter to Agility describing the staffing and other problems Agility was encountering at the DRMO locations.  JX 163.  On June 12, 2008, William Pratt, Agility's Vice President of Operations, responded that, "our planning wasn't perfect and we underestimated resource requirements in some areas.  We are making staffing and automation adjustments where appropriate."  JX 166 at 1.

Following the meeting with Lt. Gen. Dail, Agility submitted a Corrective Action Plan to the Government addressing the identified deficiencies in performance, most of which related to additional staffing needs, and in some cases, additional equipment.  Mohr, Tr. 176-79; JX 167.  John Hamilton, President and CEO, stated that he would increase the staffing at the DRMOs "by more than 50% at no additional cost to the [G]overnment."   JX 167 (email transmission).  Agility hired 105 extra personnel, 66 of which were assigned to Camp Arifjan.  Mohr, Tr. 180-81; JX 167.  Agility also dispatched fifteen additional employees from its headquarters to improve Agility's performance. Mohr, Tr. 182.  Agility understood that the initial number of staff assigned to the Contract was insufficient and that more employees would be needed.  Mohr, Tr. 167, 224.

Despite Agility's assertion that there would be no additional cost to the Government, Agility attempted to obtain the Government's consent to fund its additional personnel.  Mohr, Tr. 174-75, 186, 314-17.  The Government was aware that Agility had added extra staff and was processing work in excess of the Delivery Order baselines, but insisted that

the requirements of clause H.19 had not been met. Mohr, Tr. 314-17. In order to warrant a funding adjustment, clause H.19 required an increase above 150% of the workload for the previous three months. Since the workload from the beginning of performance was high, there never was a time that the increase was above 150%. Agility did not submit a formal proposal to increase staff under clause H.19. Mohr, Tr. 296.

In March 2009, after months of dialogue, the parties entered into a bilateral modification amending clause H.19 so it would apply whenever the workload was more than 25% above the fiscal year 2008 average for a given DRMO location. JX 35 at 2-3.

On November 13, 2008, the Government exercised the first option year. JX 31. During the entire period of contract performance, Agility realized $44,182,364.35 in scrap sales. DX 7 at 11. In the fall of 2009, Public Warehouse Company ("PWC"), the parent company of Agility, was accused of fraud against the United States, and PWC and its affiliates, including Agility, were barred from contracting with the Government. On June 30, 2010, the Government terminated the contract for convenience. Stip. ¶ 23. On June 29, 2011, Agility submitted a claim for termination settlement costs in the amount of $2,194,509.56. JX 48 at 2. On December 20, 2012, the parties negotiated a settlement of this claim for $757,972.63. Id.

Discussion

A. Jurisdiction

This Court has jurisdiction over claims for an equitable adjustment to a government contract pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). The Court hears contractor appeals from the final decision of a contracting officer under the Contract Disputes Act, 41 U.S.C. § 7104(b). Agility timely appealed from the contracting officer's final decisions within twelve months from receipt. Id.

B. Standard of Review

The Court reviews an appeal of a contracting officer's final decision *de novo* under 41 U.S.C. § 7104. Case law interpreting the Contract Disputes Act makes clear that "when suit is brought following a contracting officer's decision, the findings of fact in that decision are not binding upon the parties and are not entitled to any deference." Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994); see also Assurance Co. v. United States, 813 F.2d 1202, 1206 (Fed. Cir. 1987). Once an appeal is taken, the contractor "has the burden of proving the fundamental facts of liability and damages de novo." Servidone Constr. Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991). A contractor is not entitled to the benefit of any presumption arising from the contracting officer's decision. Id. *De novo* review precludes reliance upon the decision's presumed correctness. Id.

(citation omitted).  "Thus, once an action is brought following a contracting officer's decision, the parties start in court . . . with a clean slate." Wilner, at 1402.

C.  Type of Contract

A threshold inquiry in this case is to determine the type of contract at issue.  The parties agree that this was mainly a firm-fixed-price contract.  Regarding the quantity term, there are three possible types of supply contracts:  those for a definite quantity, those for an indefinite quantity, and those for requirements.  Crown Laundry and Dry Cleaners, Inc. v. United States, 29 Fed. Cl. 506, 515 (1993).  The question here is whether the contract is one for a definite quantity, as the contract itself states, or for requirements, as Agility claims.  The Court is not bound by the name or label included in the contract itself.  Id. Rather, it must "look beyond the first page of the contract to determine what were the legal rights for which the parties bargained, and only then characterize the contract." Id.  "[I]f a contract is susceptible of interpretation as . . . one for requirements . . . the court should uphold it as of the requirements type." Ralph Constr., Inc. v. United States, 4 Cl. Ct. 727, 732 (1984); A-Transport Northwest Co. v. United States, 27 Fed. Cl. 206, 214 (1993).

A definite quantity contract contemplates a "fixed, definite quantity of goods or services be purchased and provided." Ralph Constr., 4 Cl. Ct. at 731 (citation omitted).  A contract that provides only estimates and not definite quantities is not a definite quantity contract.  See Rice Lake Contracting, Inc. v. United States, 33 Fed. Cl. 144, 152 n.9 (1995). On the other hand, a requirements contract is formed when the seller has the exclusive right and obligation to fill all of the buyer's needs for the goods or services described in the contract.  Modern Sys. Technology Corp. v. United States, 979 F.2d 200, 205 (Fed. Cir. 1992).  An essential element of a requirements contract is the promise by the buyer to purchase the contract subject matter exclusively from the seller.  Id.

Here, the contract is labeled as a definite quantity contract.  JX 4 at 31-32 (adding "Definite Quantity" clause, FAR 52.216-20, to Solicitation).  However, the Solicitation referred only to historical quantities processed at each DRMO site, which were intended for offerors to use in forming their own estimates for staffing the DRMOs.  The Government agrees that it "used [Agility] exclusively to perform all services required under the contract" and there was "no limit on the number of orders that may be issued." The Government sought a contractor that would perform "all tasks DRMS performs in support of the Department of Defense mission." JX. 2 at 50.  Thus, the Court concludes that Agility's contract with the Government was a requirements contract.

More important, however, is that the contract was one for a firm-fixed-price. "Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 56 (2000) (quoting United States v. Spearin, 248 U.S. 132, 136 (1918)).  "In firm fixed-price

contracts, risks fall on the contractor, and the contractor takes account of this through his prices." McNamara Constr. of Manitoba, Ltd. v. United States, 509 F.2d 1166, 1170, 206 Ct. Cl. 1, 8 (1975).  The assumption of risk in the contract is more material to the Court's analysis than the quantity term.

### D.  Effect of Clause H.19

Agility argues that clause H.19 is not a valid economic price adjustment clause under the Federal Acquisition Regulation ("FAR"), and that clause H.19 is inapplicable because it has no discernible effect.  Agility established at trial that clause H.19 is complex and confusing, a conclusion that the Court readily accepts upon a full reading.  Agility also argues that clause H.19 does not foreclose Agility's other avenues of recovery because of the Government's alleged withholding of superior knowledge.   In response, the Government argues that clause H.19 is a valid economic price adjustment clause and is the exclusive vehicle for Agility to recover costs for increased workloads.

The Court need not determine the precise meaning of clause H.19 because it was agreed upon by the parties and Agility never challenged it until after contract performance had begun.  In fact, Agility addressed clause H.19 in its proposal in a section entitled "Handling Workload Increases (H.19)." JX 21, at 285.  Agility acknowledged that "[w]hen it is clear that a surge is imminent, our DRMO Site Managers will hire additional . . . personnel, and transfer them to the appropriate location. . . . The impact of workload surges will be mitigated by our continuous and open communications with generators and other customers.  By working closely with customers to understand their projected requirements, we can plan for surges and shift resources to meet those requirements."  Id.

In interpreting proposed contract provisions appearing in a solicitation, the Federal Circuit has held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  Blue and Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir 2007).  The reasoning of Blue and Gold "applies to all situations in which the protesting party had the opportunity to challenge a solicitation before award and failed to do so."  COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1382 (Fed. Cir. 2012).  Agility claims that clause H.19 is so patently confusing and useless that it should be ignored, yet Agility agreed to clause H.19 and referenced the clause in its proposal.  Although the Court agrees that the clause is difficult to employ and potentially unhelpful, it nevertheless declines to relieve Agility from the contract terms to which it expressly agreed.

Further, as will be explained, the Court does not need to address whether clause H.19 forecloses Agility's claims of constructive change or negligent estimate because those claims otherwise fail on their merits.  The Government did not act negligently or culpably

in the solicitation process.  For the reasons stated below, the Government did not legally err when it provided historical workload data in the Solicitation instead of creating projections or estimates.

### E.  Agility's Theories of Recovery

For its pre-March 2009 claim, Agility advances three theories in support of its equitable adjustment claim:   (1) that a constructive change occurred; (2) that the information provided to offerors during the competitive acquisition phase constituted a negligent estimate; and (3) that DRMS breached the warranty of reasonable accuracy regarding the information provided during the competitive acquisition phase.

#### 1.  Constructive Change

A constructive change occurs when the contractor performs work exceeding the contractual requirements, without a formal change order, either because of an informal government order or through the fault of the government.  LB&B Assocs. Inc. v. United States, 91 Fed. Cl. 142, 153 (2010).  The change component of a constructive change requires proof of work not required by the contract.  Delhur Indus., Inc. v. United States, 95 Fed. Cl. 446, 461 (2010).  The order/fault element requires proof that the additional work was caused by the government.  Miller Elevator Co. v. United States, 30 Fed. Cl. 662, 678 (1994).  When proceeding under the "fault" theory, the contractor must demonstrate a deficiency in the contract, such as a defective specification or non-disclosure, or some misconduct by the government in the administration of the contract.  Id.  This is the only theory that Agility advances.

Agility contends that a constructive change occurred based upon DRMS's non-disclosure of its superior knowledge about scrap estimates and troop movements.  A constructive change predicated upon the government's non-disclosure of superior knowledge is proven by demonstrating the following: (1) "a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration;" (2) "the government was aware the contractor had no knowledge of and had no reason to obtain such information;" (3) "any contract specification supplied misled the contractor or did not put it on notice to inquire;" and (4) "the government failed to provide the relevant information."  Id. at 675.  The Government argues that Agility does not actually advance any evidence of a constructive change, but instead "contests the Government's method of informing offerors of the possibility that the workload the contractor was required to handle could fluctuate."  Gov.'s Reply at 11.  According to the Government, Agility is basically arguing that providing historical workload data was the wrong choice, and the Government should have provided estimates and projections instead.  Weighing these positions, the Court agrees with the Government.

Amendment 4 to the Solicitation contained questions and answers from prospective offerors, which included Question 11:

> Technical Exhibit (TE) -1, Para (a) – Offerors are required to anticipate variations in property flow during the contract. Considering the current increase in war fighters and plans to reduce troop strength during the life of the contract, variations in flow should be substantial. Therefore, to help alleviate pricing contingencies, could the government estimate the magnitude of the flow variations?

JX 4, at 135. The Government answered, "[w]e anticipate an increase in property turn-ins." Id. The Government also explicitly declined to provide workload projections. JX 21 at 202. It did, however, provide historical workload data.

Agility offered no evidence at trial that DRMS had knowledge of specific planned troop movements, or even how this knowledge would have been helpful to Agility in staffing the DRMOs. Agility presented no evidence that troop movements are predictable, reliable events, and the Court finds that the opposite is likely true in a warzone environment. Predicting future troop movements over the coming year is akin to asking the Government "to be clairvoyant," which it is not required to do. See Service Technicians, Inc. v. United States, 37 Fed. Cl. 383, 387 (1997) (quoting Womack v. United States, 389 F.2d 793, 802, 182 Ct. Cl. 399, 412-13 (1968)). In fact, any scrap estimates based on forecasted troop movements would likely be inaccurate, and potentially more misleading than historical workload data.

Further, Agility's argument that the Government possessed "estimates" that it withheld from offerors is not persuasive. The Government's decision not to provide estimates does not amount to fault or superior knowledge. The Federal Circuit has held that a decision to provide reasonably available historical data instead of generating estimates for a complex contract is reasonable, and the Government need not "search for or create additional information." Medart, Inc. v. Austin, 967 F.2d 579, 582 (Fed. Cir. 1992). The Court finds that Agility cannot criticize the Government for providing historical data instead of estimates. The Government did not constructively change the contract by failing to provide estimates of future troop movements.

## 2. Negligent Estimate

Although similar in theory, a contractor's right to disclosure of the Government's superior knowledge is not coextensive with a contractor's right to non-negligent estimates in requirements contracts. Fed. Group, Inc. v. United States, 67 Fed. Cl. 87, 102 (2005). When awarding a requirements contract, the FAR requires the Government to provide an estimate of its contract requirements in the solicitation. According to FAR 16.503(a)(1):

> For the information of offerors and contractors, the contracting officer shall state a realistic estimated total quantity in the solicitation and resulting contract. This estimate is not a representation to an offeror or contractor that the estimated quantity will be required or ordered, or that conditions affecting requirements will be stable or normal. The contracting officer may obtain the estimate from records of previous requirements and consumption, or by other means, and should base the estimate on the most current information available.

Government estimates are "not guaranteed, [but] bidders are ordinarily entitled to rely on estimates as representing honest and informed conclusions when preparing their bids." Ravens Group, Inc. v. United States, 112 Fed. Cl. 39, 50 (2013). Where a contractor can demonstrate by a preponderance of the evidence that estimates were "inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made[,]" the Government can be held liable for resulting damages. Medart, Inc., 967 F.2d at 581 (quoting Clearwater Forest Indus., Inc. v. United States, 650 F.2d 233, 239, 227 Ct. Cl. 386, 395 (1981)).

Agility cites cases where a contractor was granted an equitable adjustment after a negligent government estimate, primarily relying on Crown Laundry, 29 Fed. Cl. 506, and Chemical Technology, Inc. v. United States, 645 F.2d 934, 227 Ct. Cl. 120 (1981). In Crown Laundry, the Government negligently overestimated its needs for laundry and dry cleaning services in a fixed-price requirements solicitation. In forming its estimates, the Contracting Officer's Representative ("COR") simply asked the Redstone Arsenal's using activities to determine the types and quantities of services anticipated for the coming year. The COR used these estimates *instead of* providing pickup and delivery tickets from the previous year, or verifying the estimates by other means. This Court found that the Government negligently and inaccurately estimated its needs in the solicitation. The Court noted that the Government "is not free to carelessly guess at its needs." Crown Laundry, 29 Fed. Cl. at 520 (quoting Medart, 967 F.2d at 581). Importantly, the Court stressed that if the COR had "felt it unnecessary to search for or to create additional information since using activities are supposed to know their needs," it would be "hard to criticize the government if subsequently, the estimates turned out to be higher than later events established they should have been." Id. at 523. However, the COR in Crown Laundry had reason to believe the estimates were exaggerated, and were likely careless guesses. Thus, the COR should have verified the estimates with actual pickup and delivery tickets.

Contrary to Agility's characterization, the facts in the present case establish the opposite scenario. Rather than carelessly forming estimates by asking the DRMOs to guess their upcoming needs, DRMS provided objective, historical workload data from which the

offerors could extrapolate future needs.  The Government indicated to offerors that the property turn-ins would increase, and troop drawdowns were publicly anticipated. Agility's analogy to Crown Laundry must fail.

In Chemical Technology, the Navy invited bids for the procurement of mess attendant services in a food service building at the Naval Construction Battalion Center in Port Hueneme, California.  227 Ct. Cl. 120.  The contract included a price adjustment clause, but otherwise was for fixed-price requirements. Id. at 122-23.  The Chief Warrant Officer ("CWO") prepared a monthly meal estimate for the contract by asking the personnel offices to provide their anticipated manpower in the coming year. Id. at 125. The CWO also consulted the previous year's meal count and barracks records to derive a percentage "utilization factor." Id.  The CWO was guided by Naval Supply Systems Command Instructions, which required him to base estimates on recent past experience and adjust them for "known or anticipated changes." Id. at 126.  The Naval Supply System Instructions also required the CWO to itemize nonrecurring events, or "Special Events." Id.  The CWO completely omitted Special Events from the solicitation and the contract.

The CWO was or should have been aware that reserve battalions sometimes conducted a two-week active duty for training at Port Hueneme, and two such battalions were on the base and eating at the CWO's mess hall at the time he was compiling the estimates. Id. at 127-28.  Still, the CWO failed to include reserve battalion training in the estimates for offerors.  Thus, offerors had "no notice whatsoever" that "there remained the possibility that during the course of the contract several reserve Naval Construction Battalions might show up to train and be fed at Port Hueneme." Id. at 129.  In fact, four reserve battalions trained and ate at the base during the contract year.  The Court found that an effectively "zero estimate" of the number of reservists training and eating at the facility was unreasonable, and may have "actually misled the contractor." Id. at 142.  The Court granted an equitable adjustment for the cost of feeding the four battalions. Id. at 148.

At first glance, the facts and reasoning of Chemical Technology appear to be relevant to the present case.  However, the Court finds key distinctions that make those facts inapposite.  First, the solicitation in Chemical Technology provided "no notice whatsoever" to offerors that a volume variation might occur due to the influx of reservists to the mess hall.  In contrast, the offerors in this case were well aware of volume variations in the processing of surplus property.  Agility offered no evidence that a specific type of foreseeable event, of which it was completely unaware, caused the workload increases. Second, the CWO in Chemical Technology ignored a Naval Supply Systems Instruction to provide offerors with estimates of Special Events.  Agility has proffered FAR regulations and case law outlining the Government's duty to use information reasonably available to it, but these broad requirements do not amount to a specific failure to adhere to regulations and put offerors on notice of special events that occurred in Chemical Technology. Importantly, the Court in Chemical Technology only awarded an equitable adjustment for the cost of feeding the four reserve battalions at the base.  Here, in contrast, Agility points

to no specific cause-and-effect links to isolate its damages; instead, Agility claims the inadequacy of the workload data constituted general negligence that affected the entire solicitation and caused the ensuing contract performance issues.    Third, <u>Chemical Technology</u> was decided in 1981 under the then-current leading case of <u>Womack</u>, 182 Ct. Cl. at 413.  The Court now looks to the Federal Circuit's more recent decision in <u>Medart</u> as the lead case for negligent estimate claims.

Under the holding in <u>Medart</u>, the fact that other methods of providing information to offerors "might have improved the accuracy of the government estimates . . . does not mean the approach selected was not reasonable."  967 F.2d at 581-82.  When the scope of a contract is extensive or complex, like the unpredictable demilitarization of vehicles, weapons and other property in the Middle East, there may be "no central point to obtain accurate predictions of orders."  <u>Id.</u> at 582.   In that case, if the Government "used information that was reasonably available[,] . . . it need not search for or create additional information."  <u>Id.</u>  The Government here used reasonably available historical data and did not negligently estimate its needs in the Solicitation.

### 3.   Breach of Warranty of Reasonable Accuracy

Alternatively, Agility contends that it is entitled to an equitable adjustment due to an alleged breach of the warranty of reasonable accuracy.  The warranty of reasonable accuracy is a corollary to the concept of negligent estimate, which applies even in the absence of a finding of fault.  <u>See Troise v. United States</u>, 21 Cl. Ct. 48 (1990).  However, to prevail on this theory, Agility must prove that DRMS made a material representation as part of the Solicitation, without a caveat or disclaimer, upon which Agility actually and justifiably relied, to its detriment. <u>See</u>, <u>e.g.</u>, <u>Everett Plywood & Door Corp. v. United States</u>, 419 F.2d 425, 431, 190 Ct. Cl. 80, 92 (1969).

This theory does not aid Agility.  The Government expressly declined to provide estimates to offerors, and thus cannot be held to have made a material representation upon which Agility could have justifiably relied to its detriment.   Instead, the Government provided reasonably accurate historical information and asked offerors to form their own estimates.  <u>See Cedar Lumber, Inc. v. United States</u>, 5 Cl. Ct. 539, 546 (1984) (stating that "if the purchaser warrants in the contract that it relies on its own information for bidding purposes and not on the information embodied in a government estimate . . . the warranty of reasonable accuracy in the bidding estimate will be a nullity.") (citations omitted).  The Court finds no breach of a warranty of reasonable accuracy by the Government.

### F.  Equitable Adjustment for Post-March 2009 Work

Agility's claims for equitable adjustment for work performed after the March 2009 contract modification depend largely on its theories of recovery for work performed prior to the modification.  As the Court has found that Agility is not entitled to recovery for its

pre-March 2009 claims, it must also find that Agility fails on its post-March 2009 claims. The Government did not negligently estimate the workloads or constructively change the contract.  Therefore, Agility is not entitled to recover damages for initially relying on the historical workload data and later augmenting its staff for Fiscal Year 2008.  Agility voluntarily entered into the bilateral modification and was compensated according to the modification's terms.

Conclusion

The ultimate goal of an equitable adjustment is to do equity.  <u>Ralph L. Jones Co., Inc. v. United States</u>, 33 Fed. Cl. 327, 331 (1995).  Agility entered into a firm-fixed-price requirements contract with the Government for the operation of DRMO facilities at bases in the Middle East.  The considerable risk of the contract is apparent on its face.  The Government allowed the contractor to keep all proceeds from scrap sales in order to offset at least some of the risk.  Although Agility faced workloads significantly in excess of what it anticipated, Agility still received over $44 million in scrap proceeds over the 27 months of the contract.  DX 7 at 11.  The fact that the scrap proceeds were "22.9% lower" than Agility's projections does not move the equities in Agility's favor.  <u>Id.</u>  For the reasons stated above, the Court DENIES Agility's claim for an equitable adjustment, and the complaints are dismissed with prejudice.

IT IS SO ORDERED.

<u>s/ Thomas C. Wheeler</u>
THOMAS C. WHEELER
Judge