# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

Nos. 13-55C, 13-97C (Consolidated)

(Filed: October 18, 2017)

| | |
|---|---|
| ******************************************* * <br> * <br> AGILITY DEFENSE & GOVERNMENT * <br> SERVICES, INC., * <br> * <br> Plaintiff, * <br> * <br> v. * <br> * <br> THE UNITED STATES, * <br> * <br> Defendant. * <br> * <br> ******************************************* * | Contract Claim for Disposal of Surplus Property in Middle East; Requirements Contract; Use of Historical Data; Negligent Estimate; Mandate Rule; Equitable Adjustment; Actual Cost Method; Damages. |

*W. Brad English*, with whom were *J. Andrew Watson, III*, *Jon D. Levin*, *Brian J. Chapuran*, and *Emily J. Chancey*, Maynard Cooper & Gale, P.C., Huntsville, Alabama, for Plaintiff.

*Michael D. Austin*, with whom were *Chad A. Readler*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Kenneth M. Dintzer*, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., as well as *James Hewitt*, Defense Logistics Agency, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

     This case is before the Court on remand from the United States Court of Appeals for the Federal Circuit to determine the proper amount of damages due Plaintiff Agility Defense & Government Services, Inc. ("Agility"). The Federal Circuit instructed this Court to calculate Agility's equitable adjustment arising from damages Agility incurred from performing in excess of its contract with Defense Reutilization Management Services ("DRMS") to dispose of surplus property received from the military services as troops were departing from areas of operation in Iraq, Afghanistan and Kuwait. Agility Def. & Gov't Servs., Inc. v. United States, 847 F.3d 1345, 1354 (Fed. Cir. 2017).

For the reasons explained below, the Court finds that Agility is entitled to a total equitable adjustment of $6,906,339.20, plus interest.  The Court bases this conclusion on a finding that this calculation accurately captures the cost of additional, unanticipated work Agility had to perform on the contract as a result of DRMS' negligent estimates.

A detailed factual history of this case can be found in the Court's previous opinion in this matter.  See Agility Def. & Gov't Servs., Inc. v. United States, 122 Fed. Cl. 677 (2015).  The Court will provide a brief overview of the facts relevant to the issues currently on remand.

Findings of Fact[1]

The Defense Logistics Agency ("DLA") provides supplies to the military services and supports Department of Defense acquisition activities.  Stip. ¶ 1.  DRMS is a primary field activity of DLA.  Id.  DRMS is responsible for the disposal of all excess personal property generated by the military services worldwide.  Stip. ¶ 2.  To accomplish its mission, DRMS has established Defense Reutilization and Marketing Offices ("DRMOs") at locations throughout the world.  Id.  Each DRMO is a receiving and processing facility for surplus property.  Stip. ¶ 3; Mohr, Tr. 156.

Prior to 2007, the Government performed in-house all of the work relating to the receipt and processing of surplus property.  Stip. ¶ 4.  In December 2006, the Director of DRMS determined that the agency could not adequately support the surplus property functions in the future. Washington, Tr. 416–17.  Agency management was concerned that the "planned movement of U.S. Military forces" would create more work than the agency could handle.  JX 20 at 2.  At that point, the agency decided to solicit and award an outside contract for this work.  Stip. ¶ 4; Washington, Tr. 416–17.

On January 18, 2007, DRMS issued Solicitation No. SP4410-07-R-007 seeking a contractor to perform all surplus property disposition services at six locations in Southwest and Central Asia.  Stip. ¶ 5; JX 2.  The six locations were at Bagram, Afghanistan; Camp Arifjan, Kuwait; and Camps Anaconda, Victory, Al Asad, and Speicher, Iraq.  JX 2.  In Block 7 of the coversheet to the Solicitation, the Government explained:

> All potential firms should understand that this [Request for Proposal] is accompanied by a Statement of Objective (attachment 1).  The goal is for firms to develop and submit a Performance Work Statement that will outline in detail how it

---

[1]  The Findings of Fact are based upon the evidentiary record created at trial.  Citations to the record in this opinion are as follows:  (1) January 14, 2015 Joint Stipulations of Fact (Stip. ¶ __); (2) Trial testimony (Witness name, Tr. ____); (3) Joint Exhibits, JX __; (4) Plaintiff's Exhibits, PX __; and (5) Defendant's Exhibits, DX __.

> proposes to fulfill the mission requirements of DLA/DRMS.
> Firms are encouraged to where practical offer efficient
> commercial solutions that will enhance the mission while at the
> same time reduce cost.

Id. at 1.  The Solicitation as amended contemplated the award of a single contract for a base year and four one-year options.  Id. at 48; JX 4 at 6.[2]  The Government planned to award a combined firm-fixed-price, time and materials, and cost reimbursement contract. JX 4 at 6.  The firm-fixed-price portion covered the first six contract line items, one for each of the six designated locations, and the time and materials portion covered other locations within Iraq, Afghanistan, or Kuwait where work might be required.  Id. at 7–12. However, the contract is predominantly for a firm-fixed-price, and only the firm-fixed-price line items are at issue in this case.  Section M of the Solicitation as amended stated that award would be made on a best value basis, considering past performance, price and the other evaluation factors listed.  Id. at 57.

Amendment 004 to the Solicitation contained a listing of the questions and answers between the agency and the offerors prior to the Preproposal Conference.  Id. at 131–58. Question 122 asked the Government to provide the workload history and projection by category and location.  The Government responded by stating "[w]orkload history and current inventory levels can be found at http://www.drms.dla.mil/newproc/index and link to 'DRMS information for Southwest/Central Asia.'  The Government does not have workload projections."  JX 21 at 201–02.

The agency's website contained historical workload information for each of the six DRMO locations covered by the contract.  Washington, Tr. 421–22; Baker, Tr. 43.  The agency updated the website's workload data on a regular basis.  Washington, Tr. 422.  The workload was measured by the weight of scrap processed and by the number of line items. Baker, Tr. 43, 47, 48.  The website also showed the number of direct and contract staff members employed by DRMS at each location.  Baker, Tr. 48; JX 50 at 3; JX 59 at 4; JX 66 at 4; JX 73 at 3; JX 76 at 4; JX 80 at 4.  DRMS used the workload data for August 4, 2007 as the baseline when issuing delivery orders under the contract.  JX 80 at 4.

Prior to 2007, Agility acquired Taos Industries, Inc., a small firm based in Huntsville, Alabama.  Taos specialized in performing logistics contracts for the U.S. Government, but it had not previously operated a DRMO.  Baker, Tr. 38.  Agility hired three former DLA employees to provide expertise in preparing its proposal in response to the Solicitation, including the development of a Performance Work Statement ("PWS"). Baker, Tr. 39.

---

[2]  There were at least nine amendments to the Solicitation, although not all of them are included in the evidentiary record.  See JX 2 – JX 8.

Agility was one of three offerors to submit a proposal in response to the Solicitation. Stip. ¶ 14. The agency's Source Selection Authority determined that Agility's proposal provided the best overall value to the Government. Agility's final price was $45,233,914.92. Baker, Tr. 68; JX 16 at 8. The final price reflected a $20,342,608.00 offset for revenues expected from scrap. JX 10 at 17. Agility's proposal was based upon a staffing plan of 174 persons. Baker, Tr. 40; JX 10 at 35–38.

DRMS notified Agility on November 29, 2007 that its proposal had been accepted for award. Stip. ¶ 16. The parties executed Contract No. SP4410-08-D-2000 ("the Contract") on the same day. JX 21. The Contract contained six line items, one for each of the DRMO locations, and each line item had a firm-fixed-price to be paid on a monthly basis. Id. at 51. The Contract also contained clause H.19, "DRMO Workload Changes," which stated the following:

> During operation of the DRMO locations, the contractor may experience significant workload increases or decreases. When workload increases at any DRMO location by more than 150% above the average workload at the DRMO location for the preceding three (3) consecutive months and a determination is made jointly by the [Contracting Officer's Representative] and On-site contractor representative that the increase will continue for more than two (2) months and contractor staff at the DRMO is insufficient to manage the workload increase, the contractor may submit a proposal to add labor and materials to handle the increase under the Time and Material CLINs. When there is a significant workload decrease in excess of 50% or more at a DRMO that has not experienced a significant workload increase, and the decrease extends to four (4) consecutive months, the Government shall have the right to terminate the CLIN that covers the DRMO and renegotiate the price paid the contractor to operate the DRMO. When the Government notifies the contractor in writing of its intent to terminate the CLIN for the purpose of renegotiation, the contractor will be required to submit a proposal to continue operating the DRMO based upon the average workload at the location for the previous six (6) months excluding surges or significant workload increases.

Id. at 71–72. The Government designated this clause as "DRMS (JUL 2007)."

The agency ordered work under the Contract by placing Delivery Orders for each DRMO site. Washington, Tr. 453. The initial Delivery Orders were issued in January and February 2008. The Delivery Orders incorporated the "workload baseline" for each

DRMO site as reflected by the historical data in the website update for August 4, 2007. The agency calculated the monthly baseline from the August 4, 2007 website update by adding together the two figures for "Received Line Items," each for a one-week period, and then doubling the total to obtain the monthly line items.  The baselines were as follows:

| DRMO | Monthly Baseline | Annualized Baseline |
|---|---|---|
| Speicher | 1,064 | 12,768 |
| Victory | 1,166 | 13,992 |
| Al Asad | 1,218 | 14,616 |
| Anaconda | 1,662 | 19,994 |
| Arifjan | 9,130 | 109,560 |
| Bagram | 540 | 6,480 |

JX 50 at 3; JX 59 at 4; JX 66 at 4; JX 73 at 3; JX 76 at 4; JX 80 at 4; PX 114 at 2.  The annualized baselines are derived simply by multiplying the monthly baseline by twelve.

From the beginning of performance, the actual workload experienced at each of the six DRMO locations, with the exception of Camp Speicher, Iraq, was much greater than the workload baselines established in the August 4, 2007 Historical Data.  Mohr, Tr. 172; PX 114 at 1–3, JX 186 at 1–2.  The actual annual workloads experienced from March 2008 to March 2009, by number of line items, were as follows:

| DRMO | Actual Workload | % of Annualized Baseline |
|---|---|---|
| Speicher | 9,561 | 74.9% |
| Victory | 21,899 | 156.5% |
| Al Asad | 24,392 | 166.9% |
| Anaconda | 71,653 | 358.4% |
| Arifjan | 242,401 | 221.3% |
| Bagram | 15,364 | 237.1% |

In total, the pre-March 2009 workload for all six locations was 217.2 percent of the annualized workload derived from the single-month baseline provided in the Delivery Orders.

Agility began contract performance at Camp Arifjan, Kuwait, where more than 60 percent of the contract work would be performed.  At Arifjan, Agility inherited a backlog of approximately 70,000 line items.  Mohr, Tr. 168, 271; Burns, Tr. 556–57.  In addition to the backlog, the volume of property received at Arifjan was greater than anticipated from the very beginning.  Mohr, Tr. 172.  Agility did not have the necessary staff in place to process both the backlog work and the higher than expected level of new work.  Baker, Tr. 82-83; Mohr, Tr. 167.

In May 2008, Agility began performance at the other five DRMO locations. JX 166. Agility encountered backlogs at these locations as well, but not to the same extent as the Arifjan backlog. Burns, Tr. 559–60. To help with the additional workload, Agility hired 105 extra personnel, 66 of which were assigned to Camp Arifjan. Mohr, Tr. 180–81; JX 167. Agility also dispatched fifteen additional employees from its headquarters to improve Agility's performance. Mohr, Tr. 182. Agility understood that the initial number of staff assigned to the Contract was insufficient and that more employees would be needed. Mohr, Tr. 167, 224. Agility also noted that these increases in staffing would come "at no additional cost to the [G]overnment." JX 167 (email transmission).

Despite Agility's assertion that there would be no additional cost to the Government, Agility attempted to obtain the Government's consent to fund its additional personnel. Mohr, Tr. 174–75, 186, 314–17. The Government was aware that Agility had added extra staff and was processing work in excess of the Delivery Order baselines, but insisted that the requirements of clause H.19 had not been met. Mohr, Tr. 314–17. In order to warrant a funding adjustment, clause H.19 required an increase above 150 percent of the workload for the previous three months. Since the workload from the beginning of performance was high, there never was a time that the increase was above 150 percent. Agility did not submit a formal proposal to increase staff under clause H.19. Mohr, Tr. 296.

On November 13, 2008, the Government exercised the first option year. JX 31. In March 2009, after months of dialogue, the parties entered into a bilateral modification amending clause H.19 so it would apply whenever the workload was more than 25 percent above the fiscal year 2008 average for a given DRMO location. JX 35 at 2–3.

In the fall of 2009, Public Warehouse Company ("PWC"), the parent company of Agility, was accused of fraud against the United States, and PWC and its affiliates, including Agility, were barred from contracting with the Government. On June 30, 2010, the Government terminated the Contract for convenience. Stip. ¶ 23. On June 29, 2011, Agility submitted a claim for termination settlement costs in the amount of $2,194,509.56. JX 48 at 2. On December 20, 2012, the parties negotiated a settlement of this claim for $757,972.63. Id.

## Procedural History

Agility submitted two certified claims to the contracting officer, the first on January 31, 2012 for $4,359,071.79 covering the period April 1, 2008 through March 26, 2009, PX 114 at 1, and the second on February 6, 2012 for $1,602,148.67 covering the period March 27, 2009 through June 30, 2010, for the additional costs it incurred as a result of DRMS' negligent estimates. Dkt. No. 1, at Ex. 1 (13-97C). In addressing Agility's certified claims, the contracting officer issued two final decisions on June 14, 2012, finding that Agility was entitled to $236,363.93 on the first claim, but zero on the second claim. Agility timely appealed these final decisions to this Court on January 23, 2013 and February 5, 2013

respectively, and they were docketed as case numbers 13-55C and 13-97C. By order dated April 2, 2013, the Court consolidated these two actions for all purposes.

After conducting a three-day trial and hearing closing arguments, this Court held that DRMS' estimates were not negligent because they were based on accurate historical data and thus, Agility was not entitled to any damages. Agility Def. & Gov't Servs., 122 Fed. Cl. at 681. On appeal, the Federal Circuit held that DRMS' estimates were indeed negligent and that Agility relied on these estimates to its detriment, remanding the case to this Court for a calculation of Agility's equitable adjustment. Agility Def. & Gov't Servs., 847 F.3d at 1354. This Court ordered briefing on the issue of damages on April 18, 2017. Briefing concluded on August 30, 2017, and the Court held oral arguments on October 4, 2017.

Discussion

Cases before this Court on remand are governed by the mandate rule. Carolina Power & Light Co. v. United States, 98 Fed. Cl. 785, 794 (2011). "[E]very appellate court judgment vests jurisdiction in the trial court to carry out some further proceedings." Exxon Chem. Patents, Inc. v. Lubrizol Corp., 137 F.3d 1475, 1483 (Fed. Cir. 1998). The district court's actions on remand "should not be inconsistent with either the letter or the spirit of the mandate." Laitrim Corp. v. NEC Corp., 115 F.3d 947, 950-51 (Fed. Cir. 1997). Mandates should be interpreted by looking at the language of the judgment in combination with the accompanying opinion. Exxon Chem., 137 F.3d at 1483 (citing, *inter alia*, In re Sanford Fork & Tool Co., 160 U.S. 247, 256 (1895)).

Here, the Federal Circuit's mandate instructs this Court to calculate Agility's equitable adjustment resulting from damages it incurred from performing in excess of DRMS' negligent estimates. Agility Def. & Gov't Servs., 847 F.3d at 1354. In its briefings on the issue of damages, the Government argues that Agility has not shown it is entitled to an equitable adjustment because it "cannot demonstrate that it incurred any compensable damages." Def.'s Br. at 1. Agility counters that the Government is attempting to re-litigate issues foreclosed by the Federal Circuit's decision and mandate, Pl.'s Rep. at 1, and that it is entitled to a total equitable adjustment of $6,906,339.20, plus interest. Pl's Br. at 1. This Court finds the Federal Circuit's mandate to be clear: Agility is entitled to an equitable adjustment, which the Court must now calculate. See Agility Def. & Gov't Servs., 847 F.3d at 1354. The Court's undertaking of this task follows.

A. This Court Cannot Re-litigate Issues Foreclosed by the Federal Circuit's Mandate.

As a preliminary matter, the Court will address the Government's argument that Agility is not entitled to an equitable adjustment. The Government primarily argues that Agility cannot prove it incurred compensable damages because Agility has failed to show

7

that it relied on the information DRMS provided, Def.'s Br. at 13–14, and has failed to show that DRMS' negligence was the cause of its damages. Id. at 7–15. As a result, the Government requests that the Court deny Agility any relief. Id. at 21. However, the Federal Circuit's decision makes clear that Agility has proven reliance on DRMS' negligent estimates and that DRMS' negligence caused Agility to suffer damages. See Agility Def. & Gov't Servs., 847 F.3d at 1353. Thus, these issues are foreclosed and cannot be re-litigated when calculating Agility's equitable adjustment.

The Government also argues that the Federal Circuit's interpretation of clause H.19 limits any of Agility's damages to the first month of performance. See Def.'s Br. at 15–16. However, the Federal Circuit's decision holds that "clause H.19 bears no relevance" to the merits of Agility's damages claim. Agility Def. & Gov't Servs., 847 F.3d at 1353. As such, the Court will not consider clause H.19 in calculating Agility's equitable adjustment, to which the Court now turns.

    B. Agility is Entitled to a Total Equitable Adjustment of $6,906,339.20, Plus Interest, Using the Actual Cost Method.

    1. Standard of Review

When the Government provides a negligent estimate and a contractor reasonably relies on that estimate to its financial detriment, an equitable adjustment is the proper remedy. See Rumsfeld v. Applied Companies, Inc., 325 F.3d 1328, 1341 (Fed. Cir. 2002). The purpose of an equitable adjustment is to pay a contractor the reasonable value of the work performed, which may involve increasing the overall contract price. Crown Laundry & Dry Cleaners, Inc. v. United States, 29 Fed. Cl. 506, 524 (1993). While there are many recognized methods for calculating damages in an equitable adjustment claim, the "actual cost" method is the preferred method. See Spodek v. United States, 73 Fed. Cl. 1, 28–29 (2006); see also Hi-Shear Tech. Corp. v. United States, 356 F.3d 1372, 1381–82 (2004).

To prove damages under the actual cost method, the contractor must provide the court with specific, segregated documentation of the expenses caused by the Government's change. Doninger Metal Prods., Corp. v. United States, 50 Fed. Cl. 110, 125 (2001). While the computation of damages can be difficult and is not an exact science, the contractor will meet its burden of proving damages so long as it provides the court with a "reasonable basis for computation." CEMS, Inc. v. United States, 59 Fed. Cl. 168, 227 (2003).

    2. Agility Satisfies the Actual Cost Method.

Here, Agility has furnished the Court with ample evidence to satisfy the actual cost method. For its pre-March 2009 claim, Agility provides the Court with the following breakdown of costs for the additional labor needed to complete performance of the Contract:

| Area of Operation | Direct Labor Cost | Subcontractor Cost | Total |
|---|---|---|---|
| Iraq | $1,099,284.52 | $75,815.72 | $1,175,100.24 |
| Kuwait | $1,127,994.83 | $2,419,599.85 | $3,547,594.68 |
| Afghanistan | $209,423.97 | $0.00 | $209,423.97 |
| | | | |
| | | Total: | **$4,932,118.89** |

Pl.'s Br. at 9.  Agility likewise provides the Court with a similar breakdown for its post-March 2009 claim, after both parties bilaterally agreed to modify the Contract:

| Area of Operation | Labor Amount | Materials Amount | Total |
|---|---|---|---|
| Iraq | $352,746.48 | $0.00 | $352,746.48 |
| Kuwait | $816,091.65 | $373,467.37 | $1,189,559.02 |
| Afghanistan | $431,914.81 | $0.00 | $431,914.81 |
| | | | |
| | | Total: | **$1,974,220.31** |

Id. at 11.  These additional costs have been segregated from Agility's original staffing model and are supported by staff rosters, employee offer letters, employee timesheets, subcontractor timesheets and subcontractor invoices, all of which were submitted into the evidentiary record at trial.  See PX 113 at 1190–614; PX 114 at 69–105, 153–573, 590–670, 676–1027; Pl.'s Br. at 13–15.  Such support is sufficient to satisfy the actual cost method.  See UMC Elecs. Co. v. United States, 43 Fed. Cl. 776, 817–18 (1999).  The above computations are also reasonable, as the pre-March 2009 costs reflect relatively low rates for additional labor, see PX 114 at 678–709, and the post-March 2009 costs reflect the "time and material" rates agreed to by the parties after modifying the Contract.  See PX 113 at 1031–43; Frady, Tr. 386.

These additional costs accurately reflect the excess work Agility performed on the Contract as a result of DRMS' negligent estimates.  As such, the Court finds that Agility has met its burden of proving reasonable damages using the actual cost method and is therefore entitled to a total equitable adjustment of $6,906,339.20, plus interest.

## Conclusion

For the foregoing reasons, the Court finds that Agility is entitled to an equitable adjustment of $4,932,118.89 for its pre-March 2009 claim and $1,974,220.31 for its post-March 2009 claim, for a total damages award of $6,906,339.20, plus interest.  The Court awards Agility interest from January 31, 2012 for its pre-March 2009 claim and from February 6, 2012 for its post-March 2009 claim.[3]  The interest computation shall be based

---

[3] Interest for the post-March 2009 claim should run from the filing of Agility's certified claim with the contracting officer on February 6, 2012, not from its July 7, 2011 request for an equitable adjustment.

on the applicable method under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7109. The Court directs the Clerk to enter judgment for Agility in the amount of $6,906,339.20, plus the appropriate interest.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge